Thank you. Next matter is U.S. vs. Nocito. Good morning, Your Honor. Good morning. Thank you very much. My name is Daniel Hartnett, and I represent the interveners, Nocito Enterprises Incorporated, Palace Development Company, Inc., and Janali Properties, Inc. Can I clarify? You don't just want Exhibit J back. You want to make sure the prosecution does not use it or any derivative information at trial. Yes, Your Honor. So that's more than a request for return of property. It's not formally a motion to suppress, but in substance it is. Dabella says, you know, Dabella says anything but a pure return of property motion can't be appealed, and this looks like a suppression in all but name. But you already have the document, don't you? Exhibit J, you already have it. We have the piece of paper. You have the piece of paper. You've got all that you could interlocutorily appeal. What is it you want us to do? Send us back for an evidentiary hearing so that we can find out how the government exploited our attorney-client relationship. Why isn't that reviewable after final judgment like everything else in the case? Because we're not parties to the underlying criminal case. No, why can't we? And forgive me, Your Honor. But the government's alleging that you're basically the alter ego, the person who is the focus here is the alter ego of the, I'm sorry, the interveners are his alter ego. That's what they say, Your Honor. That if there's any liability, he's subject to restitution. Forgive me. I'm talking over it, and I didn't hear the court's question. Okay, I appreciate the apology. They're also alleging that your clients could theoretically be subject to restitution if there's a conviction, and restitution is part of the penalty. Your Honor, that takes us way downstream from where we are. We've alleged that there was an improper intrusion into the attorney-client privilege and an exploitation of it. Harbor Health Care tells us, that's the Fifth Circuit case that we've cited extensively in our briefs, that there is a continuing injury by the government's possession of privileged material. Does Mr. Nacito own 100% of the interveners? He owns and controls them, and I believe that he does own 100%, Your Honor. All right, so why shouldn't we accept this? I mean, you know, alter ego is a limited doctrine, but it sure looks like it applies here. Because they haven't proven it. That's why, Your Honor. We have shown, in the only factual submission that's been presented to the court, that there was a business purpose to our activities, that we had employees in the case of NEI, that we used and maintained bank accounts, that the IRS itself accepted the NEI. But for Perlman, you need more than that. You need a disinterested third party, and I don't see how you can say you're a disinterested third party when you're owned and controlled by Mr. Nacito. The focus of that argument on Perlman, Your Honor, is that we are powerless to be held in contempt in order to be able to achieve appellate review. So if this is not the Mr. Nacito can appeal for you. But these entities have corporate existence all of their own, Your Honor, and that's what the government wants to do is to get us to forget that these are state law created entities with rights and privileges of their own. And included among that is the attorney-client privilege. So that's a critical fact for us. The things that were at issue were independent of a grand jury proceeding. It wasn't a situation where there was an investigation, actually an indictment, focused solely at the documents involved. It focused on the entity to which the documents were key. Well, what's common to us is that in Harvard Health Care, as well as our circumstance, we contend, you have to look at does the privilege attach? Has the privilege been exploited by the government after improper acquisition? We say it has. How was it improperly acquired? My understanding is that it was turned over during a proffer session. It was after the informant was granted immunity, he shows up at his first proffer session and gives over the document. The district court has said that that document clearly embodied attorney-client communications. So what's improper? What did the government do improperly? The government, not the informant. What did the government do improperly? I think it's what it failed to do, Your Honor. It failed to say, is this attorney advice? Yes. Then I don't want you bringing this back to me, and we're going to put it in an envelope and seal it and sign it right now. Don't do this again. Don't tell me anything about what's going on with the attorneys. Understand? Wasn't it submitted through a taint? Didn't the government run it through a taint procedure? No. That's a very interesting point, Your Honor, and that's the problem. The taint procedure here, frankly, it's a cascade of blunders. In 2013, the witness turns over the document. Right at that moment, they know, the government knows that it is right at the attorney-client privilege. Instead of, yeah, several months later, the government executes a search warrant. There is nothing in the warrant that sets up the taint procedure. So in 2013, when they acquire a lot of documentary evidence, there is no taint procedure. Three years later, our defense attorneys who are looking at the documents that have been seized pursuant to the search warrant alert the government in a letter, and that's Exhibit B, that's part of our filings here. We tell them, you're having problems managing the attorney-client privilege. You're all over it. We suggest that you set up a taint team and do it the right way. At that point, the government does not deliver Exhibit J to the taint team. They set up the taint team in response to our letter, but they don't hand over what we say is an improper intrusion into the privilege. In November- What you're saying is going to, and what you said earlier in relation to Judge Peebles' question, what you really want then is to prevent the government from doing anything at the trial, as soon as the trial comes, which is derivative of Exhibit J. Yes. Which is suppression. So why wouldn't the proper procedure here be, once you get to trial, make a motion to exclude that information. If it's denied, then you've got an appellate motion, and you could possibly get a hearing on the motion in limine at that point, as to whether or not the evidence should be suppressed. But it's a classic suppression motion labeled as a 41J motion. We rely on Harbor Health Care in that department. It is not a suppression motion. What the court found in Harbor Health Care is that suppression means it's unavailable to the government to use in its case at the trial. Suppression doesn't affect return of the privileged property. Yes, you've got it. You already have it. You have the document. There's more, Your Honor. It's the derivative use that's the most troubling part of this. What did they learn from the ---- And that's where the motion in limine comes in. You would exploit that to find out what did they learn through the Poison Street. Assuming that the privilege has been violated, you want to find out what they learned from the Exhibit J and what evidence they tried to admit at trial based upon Exhibit J that could be traced back to Exhibit J. Your Honor, we'll never know. It will never come out at the trial how fully the government used the information that it acquired that it shouldn't have. And that's the troubling part to us. This isn't suppression. If you're right about that, then it's a, as we say in, I guess, what, Caesar? It's a tale told by an idiot for a sound and furious thing to find nothing. These suppression motions that we go through all the time, they don't mean anything. They're meaningless because you really never know what the government got from it when the issue was whether or not evidence is the food of the Poison Street. That's what you're arguing. To that, I would say, Your Honor, privileged property is special property. We have special concerns about, systemic concerns about making sure that the privacy interests that are wrapped up in the attorney-client privilege are respected. The government didn't respect them here. And this is not a situation where we, if there's a suppression motion, granted all it does is say to the government, you can't use it. Instead, what we want is let's go back to the district court and fully explore what they got, when they got it, and how they used it. To what end? You want to dismiss the prosecution? No, we don't. We don't have any business asking to dismiss. He's greatly interested. But we have rights as co-clients of Mr. Nacito to get our privileged property back. You have it. No, we don't, Your Honor. Wait, wait, wait. Who has Exhibit J as we see it here right now? Several people do, including the government. Are you one of those several people? Yes, Your Honor. Okay. Yes. Yes. But what we don't have is knowledge about the rest of their intrusions and the rest of their exploitations of this property improperly obtained. That is, well, that's a very important part of what we're seeking here. So your allegiance to prosecutorial misconduct is what you're alleging? No. No? No. We don't have to go that far. We are simply trying to recover our privileged property. He's short of the softball. That was a real, that one should be way, that should be in Broad Street. So far, so forth. Sorry, Your Honor, but maybe I've got two more strikes that I can think of. Touche. All right. All right. I see the yellow light, Your Honor, which I don't drive through yellow lights even. Don't get a really township. It won't matter. Your Honors, there is an important interest, public interest, that's at issue for the judicial system here. It is not right for the government to receive privileged property and then have its agents use that privileged property. I keep going back. What do you want us to do? Remand for a fact hearing so that we can explore what they got and when they got it. The facts are not disputed. I mean, the facts are going to whether or not you are entitled to return under 41G. Those facts are not disputed. Correct. Because we are the only ones who put on the facts. But we don't know what they did with it. So let's assume you have this factual hearing. Best case scenario, what do you ask the district court judge to do? To give us our property back. Have it. No. Wait, wait, wait, wait, wait. You just said a lot of people have it. I asked if your plans were included within that universe of a lot of people. You said yes. It's not just a piece of paper. It's not that you want it back. You want to take it from other people. That's different. We want the property returned. 41G appeals are about getting property back to you, not about taking it from other people. We want our property returned. The government has it and we want it back, Your Honor. It's larger than the mere piece of paper. This fits the definition of property that the Supreme Court tells us in New York Telephone we ought to be using, which is essentially any kind of property interest that someone has. I'm a real simple guy. So you have this here in front of the district court, right? District court says you get your property back. Here's your piece of paper. What more do you want the district court to do? We say thank you, Your Honor, and we have more work to do. We need to talk to the informant to find out what else he communicated. We need to talk. He's a guy, though. Isn't he your guy? No, he's a flipper, Your Honor. He's the confidential informant. Well, he's confidential, but he knows who he is. At the time, he was. But isn't he your employee? You're Mr. Nacito's employee. He worked for Nacito Enterprises, Inc., among other employers, Your Honor. I see that my time is up. I will continue going, but I also want to respect the signals. Okay. We're satisfied. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. AUSA, Matthew McHale, representing the United States. This appeal by companies owned and controlled by Mr. Nacito effectively seeks to interfere with his prosecution, which is set for trial originally in September of this year. Now it's due to go to trial in January of next year. At that trial, the government has represented that it will not use Exhibit J in the government's case-in-chief. Anything derived from it? Correct. To the extent there – That caused me a little concern. Nor elicit any testimony involving privileged information. And the prosecution team at this point is screened from Exhibit J. I have not seen Exhibit J. All I know about it is from – The appendix? No, not in the appendix that I have. It was submitted sealed to the court, but I have not seen the contents of it. Now, the contents are somewhat known based on the district court's description of it. So I just wanted to make that point here. So given, I would say, the true nature of this appeal, it should be rejected by this court for two grounds. Number one, because there is no appellate jurisdiction here, this is an interlocutory appeal from a non-final order, and any appeal in this matter is going to have to wait until after the trial next year. Second, if the court does reach the merits, as we explain in our brief, Rule 41 is not written or designed to address the kind of relief that they are seeking. In this posture, can we find that interveners are the alter egos of Mr. Nacitto? I think the record is sufficient to find that, yes. Your friend on the other side said, no, we can't find that. There need to be hearings. There needs to be evidence. So what in the record makes that sufficient? Well, the first thing I would point to is the fact that while this appeal was pending, we stayed it while there was a proceeding in the district court about a potential conflict of interest between Mr. Nacitto and these companies, and that hearing and the transcripts of which are in the record is very significant because you have Mr. Nacitto personally showing up both on his own personal account and as the corporate representative of these three corporations waiving all potential conflicts of interest here. So that cements the notion that is in the indictment, which is that these companies were alter egos and just shell companies just being used for the tax fraud, as we allege. Now, I don't think the court needs to make that finding necessarily to dismiss the appeal because I don't think you need to find alter ego just to find that the DiBello rule would bar this appeal. But I think the record is there for that. And as the court has said, there is really in the relief that the Nacitto companies have asked for, both in the district court and in their brief here to this court, they are asking for suppression. I don't think there's a way to understand their words. I mean, when they say we are, you know, in their brief, we are here to address all use of this document and root and branch. You know, we're going to attack or get, you know, sort of asking this court to do something about that. That is not, that's not for return of property. I mean, that's suppression. It's, you know, arguably to dismiss the indictment. And those motions have been brought by Mr. Nacitto below and they've been denied. So this appeal, in a sense, is just functioning as a sort of combination, you know, renewed motion to suppress but brought by these companies that he controls, renewed motion to dismiss the indictment possibly, and a fourth, you know, motion to reconsider, to sort of seek discovery into Mr. Sundo's interactions with the government. Because that's also part of the proceedings here that started out a few years ago where Mr. Nacitto filed a motion for discovery into the nature of the interaction between the government and Mr. Sundo. That was denied. He moved twice for reconsideration. Those were denied as well. So this is sort of more of the same, frankly. And, you know, as the D.C. Circuit said in the in-race sealed case decision, you know, the court is sort of allowed to look at whether the motion, something titled motion for return of property is really just something intended for strategic gain. And I think that's what this appeal really is about. So we would ask the court to dismiss for a lack of jurisdiction based on Dabella and in red grand jury from this case in 2011. Unless the court has any more questions about that, we would also ask in case the court does reach the merits that, you know, there are, I believe, as I heard counsel say, there are no real fact disputes here. And I don't I didn't hear any real plausible scenario where an evidentiary hearing, would there be anything for that to clear up? So the district court's factual observations are really not. I asked Mr. Hartnett about that. I'm not sure he agreed with me that there weren't any factual. Maybe I didn't interpret it that way. Yeah. And well, our position is certainly there are none. I mean, the district court's not the district court's decision to not turn on any fact disputes. And there aren't any that would be remain for some evidentiary hearing to clear up. It can't be a motion for a return of property because they've got the property. And finally, we would say that the district court's exercise of its discretion here to, you know, leave copies where they are. They've got the property. They are able to make use of it however they want to. And as I started out by saying, the government will not be using this document in its case in chief. And that's an adequate sort of resolution of the motion as it was presented to the court below. Unless the court has any further questions, we would ask to dismiss the appeal or on the alternative affirm if necessary. Thank you. Thank you. I was just reminded that this is not a reflection on my clerk to my greatly value. But before we began with the hearings, we should have had a procedure for the admission of two of my law clerks. When we take a brief break, we'll do the rebuttal first. Good point. See how much I care for my law clerks? I'm going to take Mr. Harkin's rebuttal away. But go ahead and give us a rebuttal first. Sorry. Four points, Your Honor. Thanks. First, it is a fact that the prosecution team here presented Exhibit J to the grand jury and inquired about the advice that was presented in the document. He was doing that of Mr. Sundo, the cooperating witness. So there has been use of our confidential. We can't remedy that. Now, you can remedy that post-trial. But in this posture, if the horses are already out of the barn, what can we do about it? Well, I offer that just to say they're exploiting this information. And so it's not accurate to say that the trial team has been screened from it. No, the trial team actually had the document and used the document. The second point that I want to make is we seek return of property. It's, sorry, in a larger sense, we are seeking return of confidentiality. The restatement allows, takes into account just that at Section 79 at Common H, and that's what we're seeking to do here, not just the piece of paper. Third, I can't tell you what we want the district court to do until after we have a fact hearing to find out exactly how the government exploited this information. How do you answer that question? You basically want the district court to suppress anything derived from Exhibit J. I don't use the S word, Your Honor. I want return of property. Because the S word gets you to develop. Well, because it misstates actually what is going on here. We're not interested in the criminal case per se. I want my confidential property back, and that's what we're entitled to get. This may be just my day, but you have it over. You have it back. Yes, Your Honor. I think we've reached the bottom on that one. Okay. And lastly, in six seconds, Your Honor, the government says there's no fact disputes. Yeah, that's because they control the facts, and we only have the ones that they've let out. We only have the facts that they control and that they have allowed out. If they don't allow them out, we can't tell exactly what they used. So, yeah, unless there's any further questions, I will sit down. Lastly, Your Honors, my clients thank the court for its courteous attention to their case. Okay. Thank you. Thank you. That's a rare bit of courtesy. We don't often experience that. Thank you. Let me tell you, Mr. McHale, was Exhibit J used before the grand jury? Were you, the EAU, say, taking it into the grand jury, first of all? I was not personally. No, it was used before the grand jury. That's all on the record, and the district court examined the, in camera, the transcript and found that it was read to the grand jury, this paragraph-long, undated-type letter. That little note that's in there. And I haven't seen it, but as described by the district court, it's an undated-type letter from Denny to Joe. Right. And there were seven lines of testimony, one question that followed that, and the district court said that it was not a primary focus of the grand jury. We certainly believe there was overwhelming evidence before and apart from this Exhibit J, and there's never been any serious explanation of how, somehow, there's this indictment followed from this minor use in front of the grand jury.  Thank you, Your Honor. I stand at recess for about 10 minutes.